IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

MARGUERITE CARRUBBA                                                    PLAINTIFF

VERSUS                                                CAUSE NO.: 1:07cv1238-LG-RHW

HARRISON COUNTY, MISSISSIPPI, ET AL.                                 DEFENDANTS

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Marguerite Carrubba ("Carrubba"), by and through her undersigned counsel, submits this Response in Opposition to Defendant Karl Stolze and William Priests' ("Defendant") Motion for Summary Judgment and would show unto the Court, the following:

In the case at bar, genuine issues of material fact exist which should preclude summary judgment.  First, the excessive force employed against Ms. Carrubba by the correctional officers has two different versions – Ms. Carrubba has one version and the Defendants have another. Moreover, the surveillance video of the incident does not show the actual takedown of Ms. Carrubba; therefore, this matter boils down to a he said/she said matter.  If anything, the video supports Ms. Carrubba's version of events.  Second, the injuries sustained by Ms. Carrubba is a genuine issue of material fact due to the physical evidence, photos, nurses notes, and various accounts of the injuries sustained.  Third, there are genuine issues of materials fact with respect to Defendants' qualified immunity claim because his actions were not objectively reasonable and were in violation of Ms. Carrubba's constitutional rights.  Finally, there exists enough genuine issues of material fact with respect to the conspiracy claims to preclude summary judgment.

Accordingly, Defendant's Motion for Summary Judgment should be denied due to numerous genuine issues of material fact.

I.     **Summary Judgment Standard**

"Summary judgment is proper when there exists no genuine issue of material fact and the movant is entitled to judgment as matter of law." *Strong v. Univ. HealthCare Sys.*, L.L.C., 482 F.3d 802, 805 (5th Cir. 2007). "The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant." *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 465 (5th Cir. 2005). To survive a summary judgment motion, the nonmovant "need only present evidence from which a jury might return a verdict in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

II.    **Excessive Force Used Against Ms. Carrubba**

    A.     **Applicable Law**

The appropriate analysis of excessive force claims by pre-trial detainees is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993). Often, there is no evidence of the correctional officer's subjective intent, ad the trier of fact must base its determination on objective factors suggestive of intent. *Id.* at 1446. The Fifth Circuit suggests the following factors: (1) extent of the injury suffered; (2) need for the application of force; (3) relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response. *Id.* at 1447. An officer's malice can be evident from the very excessiveness of his conduct. *Id.*

    B.     **Facts**

Plaintiff was brought to the HCADC on the morning of June 17, 2006 on suspicion of driving under the influence. Upon arriving at the HCADC, Ms. Carrubba was put into a holding

cell with some other female inmates. *See* Exhibit "A", Carrubba deposition, p. 36, Lines 1-4. Ms. Carrubba requested to use the phone; however, no officers responded to her request. *Id.* at pp. 36-40, Lines 5-3. Ms. Carrubba tapped on the plexi-glass of the holding cell to get the attention of the correctional officers because she wanted to use the phone. *Id.*

The correctional officers responded by placing Ms. Carrubba in handcuffs and moving her to the next holding cell where she would be by herself. *See* Docket No. 227, video. Once in this holding cell, Ms. Carrubba's slipped out of her handcuff while she was sitting on the bench. *Id.*; Exhibit "A", p. 43, Lines 7-12. Ms. Carrubba walked to the other side of the holding cell, sat on the floor, and walked back to the bench of the holding cell and sat down once again. *Id.*; Exhibit "A", p. 44, Line 24. Ms. Carrubba was not disruptive, nor a danger to anyone, including herself.

While sitting on the bench, three correctional officers entered Ms. Carrubba's holding cell. *Id.* Ms. Carrubba stood up when requested to do so. *Id.*; Exhibit "A", pp. 44-46, Lines 7-1. Once she stood, the 5 foot 4 inch, 110 lb. Ms. Carrubba was violently thrown down to the floor by two male correctional officers, William Priest and Karl Stolze, and one female correctional officer. *Id.* The officers, Priest and Stolze, pulled Ms. Carrubba's arms straight into the air and swept her feet out from under her, causing her to go chin first onto the concrete floor of the holding cell. *Id.* Ms. Carrubba was handcuffed once again and was placed on the bench of the holding cell. *See* video. Minutes later, Officer Stolze re-entered the holding cell, placed Ms. Carrubba on the floor and shackled her to the bench. *Id.* Ms. Carrubba was next visited by a nurse who told Ms. Carrubba that maybe she would be better since she was shackled to the floor. *Id.* p. 52, Lines, 12-17. Ms. Carrubba was left on the floor, shackled to the bench for approximately one hour.

### C. Genuine Issues of Material Fact

There are significant, genuine issues of material fact with respect to the correctional officers' unnecessary use of force upon Ms. Carrubba. First, the use of force report stated that Deputy Priest entered the holding cell to re-handcuff Ms. Carrubba. See Exhibit "B". The report goes on to state that once Priest entered the cell, he requested Ms. Carrubba stand up and place her hands behind her back; however, she refused, and Priest applied an arm bar takedown of Ms. Carrubba.

However, Ms. Carrubba never refused verbal commands of the Defendants. See video; Exhibit "A", pp. 44-46, Lines 7-1. The video clearly shows the correctional officer enter the holding cell and Ms. Carrubba standing up in response thereto. It is specifically disputed that Ms. Carrubba refused any verbal commands to stand up and place her hands behind her back. *Id*. Indeed, Defendant's 30(b)(6) designees, Sheriff George Payne and Captain Steve Campbell, stated upon viewing the video that Ms. Carrubba stood up when the officer entered the holding cell. See Exhibit "C", p. 97, Lines 5-6; Exhibit "I", 30(b)(6) deposition of Defendant, Payne testimony, p. 92-93, Lines 23-3. Accordingly, Defendants justification for the takedown is specifically refuted by the video evidence, Ms. Carrubba, and Defendant's 30(b)(6) designees, Sheriff George Payne and Captain Steve Campbell.

Without Ms. Carrubba refusal to obey verbal commands, the Defendants have no justification for ripping Ms. Carrubba's hands behind her back, sweeping her legs out from under her, and violently throwing her down, face first onto the concrete floor of the holding cell. The actions of the correctional officers were unnecessary, unjustified, not a good faith effort to maintain or restore discipline, done for malicious purposes of causing harm, and not a reasonable response to a perceived threat.

Finally, after the takedown of Ms. Carrubba, she was first left on the bench handcuffed. Next, while Ms. Carrubba sat on the bench and not a danger to anyone or herself, Stolze re-entered the holding cell and shackled Ms. Carrubba to the floor. *Id.* (video). Defendant's 30(b)(6) designee, Captain Steve Campbell, stated upon viewing the video that he saw no reason why the officer would re-enter and shackle Ms. Carrubba to the floor. Exhibit "C", pp. 101-104, Lines 12-23. Defendant Stolze himself testified that he saw no reason to re-enter the holding cell because Ms. Carrubba was not being disruptive. Exhibit "D", p. 103, Line 2.

The video does not show Ms.Carrubba's takedown because the takedown was in an area of the holding cell that concealed the actions of the booking officers from the surveillance camera. Thus, it is Ms. Carrubba's word against that of the Defendants as to what exactly happened. Genuine issues of material fact exist with respect to Defendants violent face-first takedown of Ms. Carrubba. Summary Judgment should be denied.

**III.   Plaintiff's Injuries**

    **A.   Evidence of Injuries**

The Defendant maintains that Ms. Carrubba has a number of pre-existing injuries which were not the result of the correctional officers' actions. However, this is specifically refuted by Ms. Carrubba.

First, Defendant alleges that Ms. Carrubba's bruised chin cannot be seen on the booking photo, and Ms. Carrubba confirmed the same. However, Ms. Carrubba stated that she saw the knot despite the grainy quality of the black and white booking photo. Exhibit "A", p. 103, Line 6-16. The pictures attached hereto show Ms. Carrubba's chin from a color hospital photo taken after the incident. See Exhibit "E". The bruise is visible. It is clear that Ms. Carrubba was slammed chin first.

5

Next, Defendant cites previous back problems of Ms. Carrubba as the source of her back pain, not the actions of the officers. However, the officers' violent, unnecessary takedown resulted in additional wrenching and twisting of Ms. Carrubba's back. Under Mississippi law, "[O]ne who injures another suffering from a pre-existing condition is liable for the entire damage when no apportionment can be made between the pre-existing condition and the damage caused by the defendant-thus the defendant must take his victim as he finds her." *Brake v. Speed*, 605 So.2d 28, 33 (Miss. 1992). Genuine issues exist as to the apportionment, if any, between any alleged pre-existing condition and the damage caused by the Defendants.

Also, Ms. Carrubba suffered damage to her rotator cuff as a result of the violent, unnecessary takedown by the Defendants. Exhibit "A", p. 147. The officers' actions of ripping her hands behind her back caused rotator cuff damage to her right shoulder. Id.

Finally, Ms. Carrubba is also suffering psychological effects from the officers' use of force. Ms. Carrubba has been diagnosed with post-traumatic stress syndrome, and is severly jumpy and nervous as a result of her incident with the Defendants. While Defendant asserts pre-existing injuries to Ms. Carrubba, Ms. Carrubba's pre-existing physical problems are a question of fact for the jury to decide, not summary judgment evidence. As such, genuine issues of material fact should preclude Defendant's motion for summary judgment.

**B.    Injuries More Than *De Minimus***

With respect to the excessive force claim, the Defendant's motion for summary judgment asserts that Plaintiff cannot establish that he suffered no more than a *de minimis* injury.

In *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Supreme Court held that a correctional officer's use of excessive physical force against a prisoner may in an appropriate setting constitute cruel and unusual punishment of the prisoner, contrary to the

Eighth Amendment, even though the prisoner does not suffer either "significant injury" or "serious injury." *Id.* 112 S.Ct. at 997 ("serious injury"), 998 ("significant injury"), 999 ("serious injury"), 1000 ("significant injury"). Likewise, *Hudson* clearly implies that merely because the injury suffered is only "'minor'" does not of itself always preclude finding an excessive force violation. *Id.* at 1000. *Hudson,* looked largely to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* 112 S.Ct. at 999. For purposes of this inquiry, *Hudson* placed primary emphasis on the degree of force employed in relation to the apparent need for it, as distinguished from the extent of injury suffered. *Id.*

A showing of some type of injury, more than *de minimus*, is necessary to assert an excessive force claim. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). In order to determine whether injuries caused by excessive force are *de minimus*, **the context in which the force was used must be examined**. *Id.* (emphasis added). "[T]he amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances.'"" *Id.* at 703-04 quoting *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)).

In *Gomez v. Chandler*, 163 F.3d 921 (5th Cir. 1999), in concluding that a prisoner's injury was not *de minimis*, the Court stated that the "application of force" was "of a character far [more] intense and [more] calculated to produce real physical harm," *Gomez*, 163 F.3d at 924. The focus was on the application of force under the context, not the extent of the physical injury suffered.

As the Fifth Circuit stated in *Beck v. Alford*, 1994 WL 442383 at *1 (5th Cir. July 27, 1994), when "there are allegations of injury together with circumstances that suggest that more

7

than *de minimis* injury **could have occurred**, or that the use of whatever force there was would shock the conscience, the stage is set for a credibility contest, and the case should go to a finder of fact." (emphasis added). It is clear that the law in Fifth Circuit focuses on the application of force, the context the force was used, and the injury that could have happened, not what injury actually did occur.

In the case at bar, it is clear that Ms. Carrubba injured her chin, torn rotator cuff, and expressed significant back problems resulting from Defendant's actions. As for Defendant's citation to *Siglar v. Hightower*, 112 F.3d 191 (5th Cir. 1997), *Siglar* dealt with an inmate receiving a bruised ear from the officer twisting it. In *Siglar*, the prisoner was stopped in the hall of his prison unit while returning from breakfast. *Id.* at 193. The guard found a biscuit in the prisoner's jacket pocket and called for backup. *Id.* The responding guard, "[w]ithout provocation, ... twisted Siglar's arm behind his back and twisted Siglar's ear." *Id.* "Siglar's ear was bruised and sore for three days but he did not seek or receive medical treatment for any physical injury resulting from the incident." *Id.* The Court held that this action did not rise to the level of excessive force and a constitutional violation, and thus, the injury was *de minimus*. In *Siglar* and the other cases discussed above, the focus was not on the resulting injury, but the context of the officers' actions and what harm could have happened to the plaintiff. In *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999), for example, in concluding that a prisoner's injury was not *de minimis*, the Fifth Circuit distinguished *Siglar* not only on the extent of the physical injury that actually resulted, but also on the fact that the "application of force" was "of a character far [more] intense and [more] calculated to produce real physical harm," as was the case in the matter *sub judice*.

In this matter, the officers unnecessarily and unjustifiably slammed Ms. Carrubba onto

8

the concrete floor, face first, with her hands ripped behind her back. There is no doubt that these actions resulted in injuries, and could have resulted in far more serious injuries. Defendant's 30(b)(6) designee, Captain Steve Campbell, who investigated use of force complaints, stated that when a person is taken to the ground face first, indeed, serious injuries can occur. Exhibit "C", pp. 104-106, Lines 24-4. The officers' actions in this context were not to restore discipline, but meant to cause harm to Ms. Carrubba. Ms. Carrubba never refused the officers' verbal commands, but Defendants took their actions anyway. The injuries and the circumstances clearly meet the threshold of more than *de minimus*.

In the instant matter, genuine issues of material fact exist regarding the need and amount of force used by the correctional officer; therefore, the Plaintiff's injuries cannot be determined to be *de minimus* simply by evaluating the physical nature of the injury. See *Hull v. Ford*, 2007 WL 1839843 (5th Cir. June 25, 2007).

## IV.    Qualified Immunity

### A.    Applicable Law

The doctrine of qualified immunity shields a government official performing discretionary functions from civil damages liability, provided his complained of actions meet the test of "objective legal reasonableness." *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). The Fifth Circuit assesses the "objective reasonableness" of an officer's actions in light of legal rules that were "clearly established" at the time those actions were taken. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Once a defendant pleads a defense of qualified immunity, the trial judge must first determine "whether the plaintiff has alleged a constitutional violation at all" under current law.

9

*Siegert v. Gilley*, 500 U.S. 226, 231-32, 111 S.Ct. 1789, 1792-93, 114 L.Ed.2d 277 (1991). If the plaintiff has done so, the judge then determines whether the defendant's actions were "objectively reasonable" with reference to "clearly established law" at the time of the conduct in question. *Siegert*, 500 U.S. at 231, 111 S.Ct. at 1792-93.

### B.   Application of Law to Facts

In the case at bar, as noted above, there is sufficient evidence to support the finding that Priest and Stolze used excessive force against Ms. Carrubba in violation of his constitutional rights. Moreover, there is sufficient evidence to find that officers' actions were not objectively reasonable. At the time of the incident, it was clearly established that inmates and pre-trial detainees have a constitutional right to be free from the use of excessive force. See, e.g., *Hudson v. McMillian*, 503 U.S. 1, 5-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The booking officers claim of qualified immunity should be denied.

## V.   Conspiracy

There exist numerous issues of genuine material fact with respect to a conspiracy among the booking officers.

### 1.   Plea Agreements

Former correctional officers have signed plea agreements and entered guilty pleas for violations of prisoners/pre-trial detainees civil rights. See Exhibit "F". In the plea agreements, Regina Rhodes, Morgan Thompson, Daniel Evans, Karl Stolze, Thomas Wills, Dedri Caldwell, and William Jeffery Priest each admitted to assaulting and witnessing assaults of inmates at the detention center. Thompson and Caldwell admitted that they each participated in over 100 assaults against inmates between May 17, 2004 and August 28, 2006. Evans admitted that he had participated in several assaults against inmates and witnessed numerous assaults of inmates

by other officers. Stolze admitted that he participated in several assaults against inmates and that he and his co-conspirators "engaged in a pattern of conduct that included, but was not limited to . . . assaulting inmates, knowing that the physical force was unnecessary, unreasonable, and unjustified." William Jeffery Priest also admitted that he committed numerous assaults on inmates. The conduct described in the plea agreements includes punching, kicking, and choking inmates. These officers also admitted that they submitted false and misleading reports regarding their misconduct.

### 2. Steve Martin Report

Steve Martin investigated the HCADC on behalf of the Department of Justice. Martin submitted a report, dated February 1, 2005, wherein he stated that there was a "very disturbing pattern of misuse of force" at the HCADC. See Exhibit "G", Martin report. Martin also found a "lack of appropriate review of incidents" and "the failure to properly investigate the incidents." *Id.* This report was sent to both the Sheriff and Harrison County Board of Supervisors. See Exhibit "H", Letter dated July 20, 2005.

Sheriff George Payne admitted receiving Martin's report. During his deposition, Sheriff Payne stated that he assigned Major Riley and Steve Campbell, of the Professional Standards Unit, to investigate the claims in the report. See Exhibit "I", p. 24, Lines 1-13. However, during the deposition of 30(b)(6) designee Steve Campbell, Campbell stated that he was never requested by Sheriff Payne to investigate these claims contained in the report. Exhibit "C", p. 54, Lines 9-15. Indeed, when asked about Steve Martin, Campbell stated, "[W]ell, what I got from him was inmates never do anything wrong, correction officers always screw up." *Id.* at p. 52, Lines 5-7.

Now, Sheriff Payne has submitted an affidavit wherein he states that once he received Martin's report, he forwarded it to the Federal Bureau of Investigation; however, Sheriff Payne

11

never mentioned this during his deposition and no record has been produced showing the report was forwarded to the FBI. It is clear that there are conflicting accounts as to whether the Sheriff took this report seriously. Sheriff Payne stated that he requested Campbell to investigate, but Campbell denies this occurred. Sheriff Payne did not mention the FBI with respect to the report during the deposition, but in support of the summary judgment motion, he now mentions involves the FBI. Clearly, the prison officials such as Campbell did not think too highly of Martin, and did not take his report seriously.

Martin's report provides official notice to both the Sheriff and Board of Supervisors about the escalating violence at the jail. However, as is evident in the plea agreements with respect to the time frame of abuse (2004-2006), the officials in charge did nothing to discourage such violence despite being on notice that it was occurring.

### 3.     Regina Rhodes Deposition

Regina Rhodes testified that the practice of abuse of inmates "was almost daily" while she was employed at HCADC from 2004 to 2006. Exhibit "J", p. 14, Lines 3-9. Rhodes described the pattern of abuse that she personally observed while she worked in booking at the HCADC. Rhodes described practices such as: red light/green light (*i.e.* abusing detainees in areas that would not be visible); targeting and taunting of persons who had been brought in on drinking charges or were drunk; falsifying reports; encouragement to falsify reports; special names for days of the week; and beating, kicking and otherwise abusing inmates. pp. 9-18.

This abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

### 4. Teel Trial Testimony

The correctional officers testified that they frequently referred to an unofficial policy of "red light, green light," which meant that officers should only strike inmates in areas that would be concealed by the jumpsuit worn by prisoners. See Exhibit "K", Priest testimony, p. 424, Lines 11-16. The face and head would therefore be considered a "red light," while the chest would be considered a "green light." The officers also testified regarding ways in which they would "fool" the surveillance cameras in booking to make it appear that inmates were resisting when in fact they were not. *Id.* at p. 408. They also testified that they would yell "stop resisting" to make others believe their violence against inmates was in response to resistance by the inmates. Id. at p. 435. The officers also had special names for the days of the week, such as "Thump a Thug Thursday." See Exhibit "L", Moore testimony, p. 556. The officers felt that the unnecessary assaults were funny and humorous. See Exhibits "K" and "L". Morgan Thompson testified that he felt like he lost touch with humanity and forgot that these inmates were human beings, and he confirmed this belief in his deposition testimony in this matter. Exhibit "M", p. 44, Lines 10-18.

As for Defendants Priest and Stolze, Stolze admitted at the Teel trial that he and Priest engaged in falsifying reports to cover-up excessive force. See Exhibit "K", Priest testimony, Teel trial, p. 426, Lines 3-4 ("Myself and Deputy Stolze putting our heads together coming up with something that sounded good.").

This abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

Using the evidence that is discussed at length *supra*, there are genuine issues of material fact with respect to whether a conspiracy to assault inmates was a moving force behind the

violation of Plaintiff's constitutional rights.

In summary, there are numerous genuine issues of material fact which preclude summary judgment in this matter. Accordingly, the Court should deny Defendant's Motion for Summary Judgment.

        Respectfully Submitted,

        MARGUERITE CARRUBBA, Plaintiff

        BY:   BROWN BUCHANAN, P.A.


        By:   */s/Patrick R. Buchanan*_____
               PATRICK R. BUCHANAN
               MARK V. WATTS

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have this day mailed by United States mail, postage prepaid, a true and correct copy of the foregoing pleading to the following counsel:

Karen Jobe Young
Meadows Law Firm
Post Office Box 1076
Gulfport, MS  39502

Cyril T. Faneca
Haley Necaise Broom
Joe Crawford Gewin
Dukes, Dukes, Keating & Faneca
Post Office Drawer W
Gulfport, MS  39502-0680

Ian A. Brendel
James L. Davis III
Post Office Box 1839
Gulfport, MS  39502-1839

This, the 14th day of December, 2009.


/s/ Patrick R. Buchanan_____
PATRICK R. BUCHANAN

PATRICK R. BUCHANAN (MSB #8439)
MARK V. WATTS (MSB #102204)
BROWN BUCHANAN, P.A.
796 VIEUX MARCHE, SUITE 1
POST OFFICE BOX 1377
BILOXI, MS  39533-1377
TELEPHONE: (228) 374-2999
FACSIMILE:   (228) 435-7090