# Exhibit C

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                     SOUTHERN DIVISION
 3
 4   GARY BRICE McBAY,
          Plaintiff,
 5
 6   VERSUS              CIVIL ACTION NO: 1:07cv1205LG-RHW
 7
     HARRISON COUNTY, MISSISSIPPI,
 8   by and through its Board of
     Supervisors; HARRISON COUNTY
 9   SHERIFF, George Payne, in his
     official capacity; CORRECTIONS
10   OFFICER MORGAN THOMPSON,
     acting under color of state law,
11        Defendants.
12
13
              30(b)(6) DEPOSITION OF HARRISON
14              COUNTY SHERIFF'S DEPARTMENT;
              STEPHEN E. CAMPBELL, DESIGNEE
15
16        Taken at the offices of Dukes, Dukes,
          Keating & Faneca, P.A., 2909 13th
17        Street, Sixth Floor, Gulfport,
          Mississippi, on Thursday, October 1,
18        2009, beginning at 1:23 p.m.
19
20   APPEARANCES:
21        PATRICK R. BUCHANAN, ESQUIRE
          MARK V. WATTS, ESQUIRE
22        Brown Buchanan, P.A.
          796 Vieux Marche' Mall, Suite 1
23        Biloxi, Mississippi  39530
              ATTORNEYS FOR PLAINTIFF
24
25
```

```
 1      Q.   And what did Mr. Martin ask you about
 2   the Towner incident?
 3      A.   Well, he just -- he just didn't like it.
 4      Q.   What did he not like about it?
 5      A.   Well, what I got from him was inmates
 6   never do anything wrong, correction officers
 7   always screw up.
 8      Q.   So he felt that in the Towner incident
 9   that it was the correctional officers that did
10   wrong to the inmate?
11      A.   Well, they did; but the way he was
12   portraying it, it was -- it was a lot more severe
13   than what happened.
14      Q.   Did he feel that -- did you do an
15   investigative report on James Towner?
16      A.   I did.
17      Q.   Did he feel that your report did not
18   capture exactly what happened?  Is that what he
19   tried to convey to you?
20      A.   No.  I don't know if he read the report
21   or not, but -- I tell you what -- no, he just --
22   he kind of just didn't believe it.
23      Q.   Didn't believe the report?
24      A.   I don't know if he didn't believe the
25   report.  He just didn't believe that -- yeah, he
```

1  THE WITNESS:
2          I'm sorry?
3  MR. WATTS:
4      Q.   You can answer.
5  MR. GEWIN:
6          I'll object to the form of the question.
7  He's asking for your thoughts, but if you can
8  answer it, you can give it a shot.
9      A.   Well, Steve Martin is a well respected
10 guy in his field, but the report -- I read the
11 report, but the sheriff didn't tell me to do
12 anything, okay, pursuant to that report.  And I
13 read it just to read it.  I mean, he gave it to me
14 to read, just to read it.  He didn't say -- he
15 didn't tell me to do anything.  And so I read it.
16         And, you know, he met -- Martin met, I
17 think, with Riley and maybe the sheriff after he
18 completed what he did and so -- you know, I'm not
19 putting anything off on them, but they -- you
20 know, that was their deal.  And, you know, if he
21 told me to do it, do something, you know, if he
22 said go do this, I would have done it.
23 MR. WATTS:
24     Q.   But what were your thoughts when you
25 read that there's -- a very disturbing pattern of

1      Q.   Okay.  But when the officer got there in
2  front of her, you saw Ms. Carrubba stand up.  You
3  don't know if she was jerked up or stood up on her
4  own, but she stood up; is that correct?
5      A.   Yeah.  Yeah, she got off the bench.
6  That's all I can tell really.
7      Q.   Was the officer in there for ten seconds
8  and then she got off the bench or was it pretty
9  immediate after he got in there?
10 MR. GEWIN:
11          Are you talking about real time or the
12 way you were running the frames?
13 MR. WATTS:
14     Q.   Well, I'm just asking your opinion.
15 Once the officer got in there, did --
16 MR. GEWIN:
17          How can you tell real time if you're
18 running it frame by frame?
19 MR. WATTS:
20     Q.   All right.  That's running it -- see the
21 seconds ticking off?
22     A.   Uh-huh.
23     Q.   One, two, it's going off in seconds.
24 All right.  At 10:52 --
25     A.   Thirty-five.

1    A.    I don't know.
2    Q.    Okay.
3    A.    Bent down.
4    Q.    The officer has exited at 11:03:36. Can you see Ms. Carrubba on the bench right now?
6    A.    I don't know. Move it a little bit and let me see. It looks like she's in front of the bench.
9    Q.    Okay. Does it look like she's sitting on the floor?
11   A.    She may be. I don't know.
12   Q.    Before that officer just came in there that time, did Ms. Carrubba do anything to have the officer come in there and shackle her to the floor?
16   A.    I don't know. He went in there for some reason. I don't know.
18   Q.    If she's making a lot of noise in the holding cell and she's handcuffed on the bench, she's sitting on the bench, handcuffed behind her back, making a lot of noise, doing a lot of yelling, is it standard operating procedure to go in that holding cell and shackle her to the floor of that bench?
25   MR. GEWIN:

Page 102

```
1            Object to the form of the question.
2     It's multi-compound.
3         A.   There was some reason he went in there.
4     I don't know.
5     MR. WATTS:
6         Q.   Under my scenario, if she's sitting on
7     the bench, handcuffs behind her and she's yelling,
8     making noise in a holding cell by herself, is that
9     a reason for an officer to go in and shackle her
10    to the floor?
11    MR. GEWIN:
12           Object to the form of the question
13    insofar as it attempts to state factually what
14    happened in this video.
15        A.   Well, you know, you're speculating, and
16    I don't know why he did.  I don't know.
17    MR. WATTS:
18        Q.   In a hypothetical situation, let's
19    assume this is factually correct.  I know you may
20    disagree what's on the video.  Let's assume this
21    is factually what happened.  She was sitting on
22    the bench handcuffed in a holding cell and she was
23    making noise by herself, not moving from that
24    bench.  An officer comes in and then shackles her
25    to the floor of that bench.  Is that a standard
```

1  operating procedure to do to someone in a holding
2  cell when they're there by theirself?
3       A.   Well, I don't believe there's a standard
4  operating procedure for doing either one, I mean.
5  I don't know.  I mean, you're asking me something
6  I don't know.  I don't know why that guy did that.
7  And it's not -- it's not a violation of policy
8  because there's not a policy that says you can't
9  put someone on the floor in there.  I don't know.
10      Q.   Is it proper to shackle someone to the
11 floor on the bench?  Is it ever proper -- I'm
12 sorry.  I'll rephrase.  Is it ever proper to
13 shackle someone to the floor on the bench?
14      A.   There was a guy that -- before that was
15 just slamming himself into the glass and all of
16 that, and they put shackles in there to shackle
17 him to the bench to keep him from hurting himself
18 or anybody else.
19      Q.   Is there shackles in that holding cell,
20 which I'm calling seven, or are the shackles in
21 the holding cell towards the end, which I'm going
22 to point in the lower left-hand corner of that
23 video --
24      A.   I know there --
25      Q.   -- which is Holding Cell 5?

1   A.   I'm sorry.  I'm sorry.  There were some
2   I know down in this -- six, is that what it is?
3   Q.   We'll call it five.
4   A.   Five, the corner one next to the tank.
5   Q.   The lower left-hand corner.
6   A.   Yeah.  There were -- I know there were
7   shackles in there before.
8   Q.   I'm going to mark Exhibit 18.  It's
9   called the Use of Restraints.  And under general
10  information it says, No restraint device will be
11  used as a form just for punishment.
12             (Exhibit 18 was marked.)
13  MR. WATTS:
14  Q.   If someone goes into that holding cell
15  because she's making noise, and then shackles her
16  to the floor, would you consider that just for
17  punishing her?
18  A.   For making noise?
19  Q.   She's making noise, and he goes in there
20  and shackles her from the bench and then shackles
21  her to the floor.  Would you consider that just
22  for punishment purposes?
23  A.   No.  I wouldn't do it for making noise.
24  Q.   Okay.  And if someone -- hypothetically
25  speaking, if an officer takes someone to the

1   ground face first while their hands are handcuffed
2   behind their back, could that person receive
3   facial injuries because they could not break their
4   fall?
5   MR. BRENDEL:
6           I object to the form.  It causes him to
7   speculate.
8   MR. GEWIN:
9           I join in the objection to form.
10  MR. WATTS:
11      Q.   You can answer.
12      A.   Well, sure, that's possible.
13      Q.   They could bust their chin possibly?
14  MR. BRENDEL:
15          Same objection.
16      A.   They could or they could do -- or
17  nothing could happen.
18  MR. WATTS:
19      Q.   But they could bust their chin, correct?
20  MR. BRENDEL:
21          Same objection.
22      A.   They could crack their skull, I guess.
23  I mean, there are a lot of things that could
24  happen, but a lot of things couldn't happen.
25  MR. WATTS:

1   Q.   I agree. And if someone were to crack
2   their skull, that would be a pretty serious
3   injury?
4   A.   That would be real bad.
5   Q.   Okay. And this will be my last video to
6   show you --
7   A.   You got the magic key.
8   Q.   -- if I can get it to come up. And I'll
9   ask you a couple of questions as to this computer.
10  What I'm going to show you is a video from Aaron
11  Vanderburg in May of 2005. And this computer
12  you're looking at in front of me, I represent to
13  you that defense counsel gave to us so we can view
14  some digital video of it. And there's a device on
15  this video. Is this device the only way you can
16  view digital video from the booking area?
17  A.   It was then, uh-huh.
18  Q.   Is there a different -- do you not have
19  to use that now?
20  A.   Well, when I left, I told you they
21  got -- they had a new Kollector, a new hard drive,
22  and you didn't have to have that.
23  Q.   While it's loading, I'll ask a couple of
24  questions so we can get done. Are you aware that
25  a number of correctional officers from the booking