# Exhibit J

```
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                  SOUTHERN DIVISION
 3
 4  GARY BRICE McBAY,
        Plaintiff,
 5
 6  VERSUS            CIVIL ACTION NO: 1:07cv1205LG-RHW
 7
    HARRISON COUNTY, MISSISSIPPI,
 8  by and through its Board of
    Supervisors; HARRISON COUNTY
 9  SHERIFF, George Payne, in his
    official capacity; CORRECTIONS
10  OFFICER MORGAN THOMPSON,
    acting under color of state law,
11        Defendants.
12
13
            DEPOSITION OF REGINA L. RHODES
14
15      Taken at the offices of Brown Buchanan,
        P.A., 796 Vieux Marche' Mall, Suite 1,
16      Biloxi, Mississippi, on Thursday,
        September 17, 2009, beginning at 2:22
17      p.m.
18
19  APPEARANCES:
20      PATRICK R. BUCHANAN, ESQUIRE
        MARK V. WATTS, ESQUIRE
21      Brown Buchanan, P.A.
        796 Vieux Marche' Mall, Suite 1
22      Biloxi, Mississippi  39530
            ATTORNEYS FOR PLAINTIFF
23
        JOE C. GEWIN, ESQUIRE
24      Dukes, Dukes, Keating & Faneca, P.A.
        2909 13th Street, Sixth Floor
25      Gulfport, Mississippi  39501
            ATTORNEY FOR GEORGE PAYNE, JR.
```

```
 1   Center.  I'm going to call it the jail just
 2   because I don't want to say four words instead of
 3   one word, frankly.  So when I say "jail," can we
 4   understand that I'm referring to the Harrison
 5   County --
 6        A.   Yes, sir.
 7        Q.   -- Detention Center?
 8             All right.  When you worked there, are
 9   you familiar with the term "brother by a different
10   mother," the phrase?
11        A.   Yes, sir.
12        Q.   What's that mean to you?
13        A.   Well, basically, we shortened it,
14   brother from another mother.  It was just to
15   explain the closeness between the folks that
16   worked at the jail.
17        Q.   All right. The correction officers that
18   worked together?
19        A.   Yes, sir.
20        Q.   And y'all were close and relied on each
21   other and depended on each other?
22        A.   Yes, sir.
23        Q.   All right. Have you heard the term "red
24   light, green light"?
25        A.   Yes, sir.
```

```
 1        Q.   Was that a phrase that was used in
 2   booking?
 3        A.   Yes, sir, it was.
 4        Q.   Tell us what that phrase means to you.
 5        A.   Red light would be the facial area,
 6   anything that you -- you weren't supposed to hit
 7   anything that would show on a booking photo, and
 8   green light would be the rest of the body.
 9        Q.   All right.  And how did y'all come to
10   use red light, green light and determine where you
11   should and shouldn't hit?
12        A.   Well, after Deputy Thompson had a
13   particularly bad booking shot of an inmate named
14   Only, OIC Teel had a impromptu meeting with our
15   shift in the back of booking and inmate records
16   and said that red light, green light -- you know,
17   that the chief was -- the chief, Captain Gaston,
18   was upset about the booking photo and that we
19   needed to be more careful.
20        Q.   All right.  Be more careful where you
21   hit people?
22        A.   Yes, sir.
23        Q.   Okay.  So it's okay to hit folks just as
24   long as it didn't show up on the booking photo?
25   MR. GEWIN:
```

1              Object to leading.
2  MS. YOUNG:
3              Object to the form.
4  MR. BUCHANAN:
5      Q.    Subject to the objection, did you hear
6  my question?
7      A.    Yes, sir, I did.
8      Q.    Okay.  So it was okay to hit people as
9  long as it didn't show up on the booking photo?
10     A.    Yes, sir.
11     Q.    People in booking, I mean, there are
12 different legal terms for them, inmates, detainees
13 and all of that.  I'm going to call them inmates
14 just for sake of ease again, not necessarily
15 subscribing any legal terms or get you to give me
16 legal opinions on the different rights owed to an
17 inmate versus a detainee and all of that.  Okay?
18 Was it common, in your experience when you were
19 there, for inmates that were brought in there to
20 be taunted by the correction officers?
21     A.    Yes, sir.
22     Q.    Tell us about that.
23     A.    If the inmate came in and was either
24 running their mouth or, you know, belligerent in
25 any way, you know, even if they weren't sometimes,

```
 1  the officers would start picking on them, taunting
 2  them, you know, if -- in particular, if somebody
 3  was looking at you, you know, looking at you hard,
 4  you know, you might say if you're feeling froggy
 5  jump or, you know, you're looking at me like you
 6  want to hit me, go ahead, stuff to that effect.
 7       Q.   Did you hear Officer Teel ever taunt
 8  inmates?
 9       A.   Yes, sir.
10       Q.   Did you hear Officer Thompson ever taunt
11  inmates?
12       A.   Yes, sir.
13       Q.   Did you hear Officer Wills ever taunt
14  inmates?
15       A.   Yes, sir.
16       Q.   How about Officer Stolze, did he ever
17  taunt the inmates?
18       A.   Yes, sir.
19       Q.   And Officer Thompson has pled guilty to
20  charges arising out of his employment there at the
21  jail and is serving time?
22       A.   Yes, sir.
23       Q.   All right.  And the same with Officer
24  Stolze?
25       A.   Yes, sir.
```

1    Q.    And Officer Priest?
2    A.    Yes, sir.
3    Q.    And Officer Wills?
4    A.    Yes, sir.
5    Q.    All right. Folks that would come in who
6    had been drinking, were they more apt to be
7    taunted by these officers?
8    A.    To me, I would say they appeared to be.
9    Q.    And why is that?
10   A.    They were easier targets.
11   Q.    Give me one minute real quick. Let me
12   jump -- and I hate to jump around on you, but I
13   need to ask a couple of questions before I ask
14   some other questions. So let me go back to
15   Exhibit 1. On Page 3 of Exhibit 1, it says that,
16   While she, being you, were assigned to the booking
17   area, you observed Teel and other corrections
18   officers engage in a pattern of physical abuse of
19   inmates at the jail. Is that a true statement?
20   A.    Yes, sir.
21   Q.    All right. More specifically, Teel and
22   other correction officers routinely participated
23   in striking, punching, kicking, choking and
24   otherwise assaulting inmates in circumstances that
25   did not justify the use of force. Is that a true

1  statement?
2      A.  Yes, sir, it is.
3      Q.  Those things, that pattern, that
4  practice of abuse, did that happen -- I mean, did
5  it happen just on one day during the time you were
6  there or did it happen for a long period of time
7  while you were employed there?
8      A.  It was almost daily while I was employed
9  there.
10     Q.  All right.  It said, Teel regularly
11 encouraged other correction officers regarding
12 their involvement in this conduct.  Is that a true
13 statement?
14     A.  Yes, sir, it is.
15     Q.  Meaning he did things and he got the
16 other officers involved in the things -- the
17 assault on the inmates?
18     A.  Yes, sir.
19     Q.  All right.  Additionally, Teel and other
20 correction officers submitted false, incomplete,
21 and misleading jail reports for the purpose of
22 covering up these assaults.  Is that a true
23 statement?
24     A.  Yes, sir.
25     Q.  All right.  And it says you were aware

1  that Teel and other correction officers were
2  submitting false and incomplete and misleading
3  reports to cover up the uses of unnecessary force
4  and failed to report their criminal conduct.  Is
5  that a true statement?
6       A.   Yes, sir, it is.
7       Q.   All right.  Those things that I just
8  read in that paragraph, do those things apply to
9  Officer Stolze?
10      A.   Yes, sir.
11      Q.   Do they apply to Officer Priest?
12      A.   Yes, sir.
13      Q.   Do they apply to Officer Teel?
14      A.   Yes, sir.
15      Q.   Do they apply to Morgan Thompson,
16 Officer Thompson?
17      A.   Yes, sir.
18      Q.   All right.  Were you there on the night
19 the incident happened with Jessie Lee Williams?
20      A.   Yes, sir, I was.
21      Q.   Before Mr. Williams was beaten to death,
22 was he taunted by the booking officers?
23      A.   Yes, sir, he was.
24      Q.   Did Mr. Williams make any comments or
25 say anything to the booking officers either before

1    or when they were taunting him?
2    MR. BRENDEL:
3              Object to the form.  When you're talking
4    about booking officers, I want to make sure we
5    know which booking officers we're talking about.
6    MR. BUCHANAN:
7         Q.   Do you recall who was on duty that
8    night?
9         A.   Yes, sir.
10        Q.   Who was on duty that night?
11        A.   Myself, OIC Teel, and Thompson.
12        Q.   Morgan Thompson --
13        A.   Yes, sir.
14        Q.   -- and Officer Teel?  All right.  And
15   did Officer Teel and Officer Thompson taunt
16   Mr. Williams?
17        A.   Yes, sir.
18        Q.   Did he say anything to Officer Teel or
19   Officer Thompson before or when they were taunting
20   him?
21        A.   While he was handcuffed he said he was
22   going to beat Teel's ass.
23        Q.   But he was handcuffed when he said that?
24        A.   Yes, sir.
25        Q.   And then after Mr. Williams was beat,

1   the nurse was called, right?
2       A.  Yes, sir.
3       Q.  And the nurse looked at him, said he had
4   a cut lip, cut ear and his eyes were puffy?
5       A.  Yes, sir.
6       Q.  And she also said, I believe, that he
7   didn't need to go to -- he didn't need to go out
8   for AMR?
9       A.  Yes, sir.
10      Q.  All right.  She said that he was going
11  to live and be okay?
12      A.  Yes, sir.
13      Q.  And I asked you this, and it's in your
14  pleas.  So the booking officers would falsify
15  their reports; is that right?
16      A.  Yes, sir.
17  MR. GEWIN:
18          Object to the form.
19  MR. BRENDEL:
20          Object to the form, time.
21  MR. BUCHANAN:
22      Q.  I'm trying to look for a page
23  discreetly, and I'm not having that much luck, so
24  I apologize.  So I'll just tell you that I'm
25  taking an extra minute here because I can't find

```
 1   the page that I was looking for.  There we go.
 2             The objection was time.  Would it be
 3   fair to say that from when you started in May of
 4   2004 until when you left in April of 2006, the
 5   corrections officers would falsify reports?
 6        A.   Yes, sir.
 7   MR. BRENDEL:
 8             Object to the form, not specifying the
 9   correction officers' names.
10   MR. BUCHANAN:
11        Q.   You and I have already talked about the
12   names of correction officers who falsified
13   reports, haven't we?
14        A.   Yes, sir.
15        Q.   Thank you.
16             (Exhibit 2 was marked.)
17   MR. BUCHANAN:
18        Q.   Exhibit 2 is the Uniform Booking/Arrest
19   Form for William David Seal, and I want to talk to
20   you about that in terms of you weren't on duty
21   when Mr. Seal was booked into the jail.  And let
22   me ask you this:  You're aware that there are
23   cameras in the jail, right --
24        A.   Yes, sir.
25        Q.   -- showing different areas of the
```