# Exhibit K

```
 1   recess for about 15 minutes.
 2          (Recess at 3:04 p.m., until 3:22 p.m.)
 3              THE COURT:  Is the government ready to proceed?
 4              MR. RICHMOND:  Yes, Your Honor.  The government calls
 5   William Jeffrey Priest.
 6              THE COURT:  The defendant ready to proceed?
 7              MR. WEBER:  Yes, Your Honor.
 8              MR. DAVIS:  Yes, Your Honor.
 9              THE COURT:  Please bring in the jury.
10       (Jury in at 3:22 p.m.)
11              THE COURT:  Thank you, ladies and gentlemen.  Be
12   seated, please.
13       Call your next witness.
14              MR. RICHMOND:  William Jeffrey Priest, Your Honor.
15              THE COURT:  Thank you.
16                          WILLIAM PRIEST
17   was thereupon called as a witness for and on behalf of the
18   government and, having been duly sworn, testified as follows:
19                        DIRECT EXAMINATION
20   BY MR. RICHMOND:
21    Q.  Good afternoon, Mr. Priest.  Could you introduce yourself
22   to the jury?
23    A.  Yes, sir.  My name is William Jeffrey Priest.
24              THE COURT:  Mr. Richmond, pull that microphone down
25   toward you, sir.  Thank you.
```

1     MR. JUPITER: Objection, Your Honor.

2     THE COURT: What is your objection?

3     MR. JUPITER: Your Honor, if he wants to state to what he has personal knowledge of, then I have no objection. But if it's just as to all booking officers, I would object.

6     THE COURT: Do you have an objection as well?

7     MR. DAVIS: Judge, I object because he's starting to give, it sounds like, an expert opinion. And we weren't ever told this witness was going to testify as an expert. We have one objection with that grounds. And then I don't know if he is qualified to even give these opinions even if he was allowed to be testifying as an expert. So I would object to any further testimony around these lines.

14    THE COURT: The objections are overruled.

15    BY MR. RICHMOND:

16    Q. Mr. Priest, did booking officers generally comply with this policy?

18    A. Not all the time, no, sir.

19    Q. Were you present at a meeting with booking officers on April 20th, 2005?

21    A. Yes, sir.

22    Q. Who else was at that meeting?

23    A. I believe all the shift sergeants were there, Captain Gaston, all the booking officers.

25    Q. What was the topic of that meeting?

```
 1   A.   Conduct in booking.  Things that we were doing improperly
 2   was covered.
 3   Q.   Specifically, was there a topic that was brought up?
 4   A.   Cussing of inmates, intimidation --
 5            MR. JUPITER:  I would object to hearsay, Your Honor.
 6            THE COURT:  Objection overruled.
 7   A.   Intimidation of inmates, cursing inmates, mistreatment of
 8   inmates.
 9   Q.   I'm showing you what's been marked as Government
10   Exhibit 11.  Do you recognize this document?
11   A.   Yes, sir.
12   Q.   Are these the notes from that meeting?
13   A.   They are.
14   Q.   Can you read the first bullet point under booking?
15   A.   "The cussing, shouting, taunting and mistreatment of
16   arrested individuals will get you fired.  It stops today."
17   Q.   Were booking officers mistreating people that came into
18   the jail?
19   A.   Yes, sir.
20   Q.   Does that include you?
21   A.   Yes, sir.
22   Q.   Does that include Defendant Teel?
23   A.   Yes, sir.
24            MR. DAVIS:  Objection to him still giving this
25   rolling opinions as he's giving, Judge.
```

MARGARET WASMUND, RMR, CRR

```
1    Q.   And how would he do that?
2    A.   Generally, just point a thumb back at the holding cell and
3    say, "Y'all go get -- y'all go deal with that."
4    Q.   And what did that instruction mean to you?
5    A.   Just means go in there and shut them up or deal with it.
6    Q.   And through what means?
7    A.   Whatever means we could, typically.
8    Q.   What would those means include?
9    A.   Again, sometimes you could talk a person out of it.  Other
10   times, we may have to get a little physical and restrain them
11   to the bench using the leg restraints.
12   Q.   Did a booking officer ever use force against an individual
13   in response to Gaston's direction?
14   A.   Yes, sir.
15   Q.   What type of force?
16   A.   There's several incidents.  Picking individuals up and
17   throwing them on the bench, drag them to the floor, things of
18   that nature.
19   Q.   And at the time that this force was used, what was the
20   person doing?
21   A.   Probably just a whole lot of talking, belligerent actions.
22   Q.   And what was your reactions to Gaston's decision to send
23   people in?
24   A.   There was times that I was pretty irritated about it, too.
25   And there was really no thought given except to go in there and
```

1   doesn't see you.

2   Q.  In what context did Defendant Gaston tell you to do what
3   you've got to do; just make sure the camera doesn't see you?

4   A.  If an individual had gotten on our nerves, was continuing
5   to become a problem, maybe we need to teach that guy a lesson.

6   Q.  How did you interpret Gaston's instruction?

7   A.  Just like I just said.  Said, you know, if you're going to
8   do it, make sure the camera doesn't see you do it.

9   Q.  Did there come a time when Defendant Gaston talked about
10  how to use force in front of the cameras?

11  A.  There was sort of jokingly a conversation between several
12  of us, including Captain Campbell down in booking, that if an
13  individual is talking with his hands or whatnot, if he throws
14  his hands in the air as an example, all you have to do is duck
15  out of the way into the camera.  And that looks like he's
16  trying to do something.

17  Q.  Can you explain what that means?

18  A.  Well, the video, as you see, is not exactly frame by
19  frame.  It's pretty choppy.  So if an individual throws his
20  hands in the air and the camera sees you ducking back out of
21  the way, it could be interpreted as that individual trying to
22  do something to you.

23  Q.  How did you interpret Captain Gaston's comments?

24  A.  That just that's one way to sort of fool the camera.  If
25  we're having a problem with an individual, it's one way to

```
 1   Q.  When you came into the next shift, did you see any of the
 2   booking officers?
 3   A.  Yes, sir.
 4   Q.  Who did you see?
 5   A.  Everybody that was off-going that was there that night.
 6   Deputy Thompson, Deputy Teel.
 7   Q.  Did you have a conversation with Deputy Teel at that time?
 8   A.  Yes, sir.
 9   Q.  What did Deputy Teel tell you?
10   A.  He said that he utilized a taser on an individual.
11   Q.  Did he tell you anything else about his use of a taser?
12   A.  Said he tased him in the gooch.
13   Q.  Mr. Priest, what is the gooch?
14   A.  That would be the area on a male's body between the
15   scrotum and rectum.
16           THE REPORTER:  Can you spell that?
17           THE WITNESS:  Best guess, G-O-O-C-H.
18   BY MR. RICHMOND:
19   Q.  What was Deputy Teel's demeanor as he told you that he
20   sprayed -- that he tased this individual in the gooch?
21   A.  He was pretty ecstatic about it.  It was kind of a big
22   joke to everybody.
23   Q.  Did Defendant Teel suggest to you that he felt like he was
24   in danger from this individual?
25   A.  He didn't indicate that, no, sir.
```

```
 1   Q.  In what context?
 2   A.  Jokingly, if somebody was being abused.  It was sort of
 3   the thing to say, "Stop resisting," whether they were or were
 4   not.
 5   Q.  Was Defendant Gaston present when people were joking about
 6   "stop resisting"?
 7   A.  At times, yes, sir.
 8   Q.  Did you hear Defendant Gaston joke about "stop resisting"
 9   himself?
10   A.  A little bit.
11   Q.  Did you ever hear or see Defendant Teel encourage other
12   officers to use force when it wasn't warranted?
13   A.  Yes, sir.
14   Q.  Did that include with female inmates in the shower?
15   A.  Yes, sir.
16   Q.  How would Defendant Teel encourage force to be used
17   against females in the shower?
18   A.  Use phrases like "spray the bitch."
19   Q.  At the time that you heard Defendant Teel say, "Spray the
20   bitch," could Defendant Teel see what was going on in the
21   shower?
22   A.  No, sir.
23   Q.  At the time that you heard that, did you perceive that any
24   force needed to be used in the shower?
25   A.  Not from my vantage point, no, sir.
```

```
 1    Q.   Was Defendant Teel the only booking officer to say, "Spray
 2    the bitch"?
 3    A.   No, sir.
 4    Q.   Who else did that?
 5    A.   I'm sure a lot of us said that from time to time.  Many
 6    number of people.
 7    Q.   Does that include yourself?
 8    A.   Yes, sir.
 9    Q.   And what would happen if the officer in the shower with
10    the female inmate didn't spray her?
11    A.   Might jokingly call her an inmate lover.
12    Q.   Was that a phrase typically used by booking officers?
13    A.   Yes, sir.
14    Q.   And what did that refer to?
15    A.   If you didn't take action against an individual inmate,
16    then you may be labeled as inmate lover, somebody that is
17    sympathetic towards inmates.
18    Q.   What did it mean to be labeled an inmate lover?
19    A.   Well, you're either with the group or you're not with the
20    group.
21    Q.   Did you hear Defendant Gaston call his officers inmate
22    lovers?
23    A.   From time to time.
24    Q.   And what was his demeanor when he called them inmate
25    lovers?
```

1   paperwork that that was the case.  There was -- there was no
2   actual booking sergeant, no.
3       Q.  So the chain of command in booking went from your position
4   as a deputy --
5       A.  Yes, sir.
6       Q.  -- to who?
7       A.  To the OIC.
8       Q.  And from the OIC to whom?
9       A.  Captain Gaston.
10      Q.  And from Captain Gaston to whom?
11      A.  To the warden.
12      Q.  On cross-examination, you were shown a list of individuals
13  from Government's Exhibit No. 11 regarding the April 20th,
14  2005, meeting.  On the top row, there are three individuals who
15  are listed going across with the rank of major; is that right?
16      A.  Yes, sir.
17      Q.  Who were they?
18      A.  Major Smith, Major Riley and Major Payne.
19      Q.  And beneath that are three captains; is that right?
20      A.  Yes, sir.
21      Q.  Okay.  And who are they?
22      A.  Captain Gaston, Captain Taylor and Lieutenant McGowan.
23      Q.  Now, Lieutenant McGowan, did he have any responsibilities
24  over booking?
25      A.  No, sir.

1  Q.  How did you -- how did you react to Defendant Gaston's
2  decision to remain silent during that meeting?
3           MR. JUPITER:  Objection to relevance, Your Honor.
4           THE COURT:  How is that relevant?
5           MR. RICHMOND:  Your Honor, it's relevant as to the
6  fact that the chain of command that they outlined in their
7  cross-examination is incorrect.  They took it off of the
8  formatting of a memo.  I think how Captain -- how --
9           MR. JUPITER:  Your Honor, I'm going --
10          MR. RICHMOND:  -- the witness --
11          MR. JUPITER:  -- to object to him --
12          THE COURT:  Wait.
13          MR. JUPITER:  -- suggesting an answer to the --
14          THE COURT:  Wait.  That's not the question.  You
15 asked the question of this witness how he reacted, how he felt.
16 I don't see how that could be helpful to the jury.  I'm going
17 to sustain the objection.
18 BY MR. RICHMOND:
19 Q.  Did you hear Defendant Gaston say anything after the
20 meeting?
21 A.  We convened down in inmate records.
22 Q.  And when you say "we," who is we?
23 A.  All the booking personnel and Captain Gaston.  He said,
24 "You know, just let them talk.  They don't understand what goes
25 on down here in booking.  They don't understand the things that

1    Q.  Have you seen Teel choke people till they passed out
2    before?
3    A.  Yes, sir.
4              MR. DAVIS:  Objection.  Speculate as to time and when
5    and just a conclusionary statement by this individual, Judge.
6              THE COURT:  To that question, the objection is
7    overruled.
8    Q.  Have you seen Defendant Teel choke people till they passed
9    out before?
10   A.  Yes, sir.
11   Q.  How many times have you seen Defendant Teel choke someone
12   until they passed out?
13   A.  Several.
14   Q.  Did you see other booking officers use this technique?
15   A.  Yes, sir.
16   Q.  Do you remember Defendant Teel teaching other booking
17   officers how to choke people till they passed out?
18   A.  Not specifically, no, sir.
19   Q.  Did Teel have any phrases that he liked to say to people
20   as he choked them?
21   A.  As he was doing it, I don't recall any.
22   Q.  Do you remember any comments that Teel would make to other
23   booking officers as he did it?
24   A.  Yes, sir.
25   Q.  What sort of phrases?

1  A.  I didn't see it, no, sir.
2  Q.  Do you know what the individual was doing when he was
3  tased?
4          MR. DAVIS:  Objection, Your Honor.  He's already said
5  he didn't see it.  I don't know how he can testify.
6          THE COURT:  Objection sustained.
7  BY MR. RICHMOND:
8  Q.  What was Teel's demeanor after the tasing?
9  A.  He was pretty excited of the fact he was the first one to
10 get to use the taser.
11 Q.  How would you describe his behavior?
12 A.  It was almost giddy in having a new toy and being able to
13 use it before anybody else.
14 Q.  Do you know Only Al-Khidir?
15 A.  Yes, sir.
16 Q.  Were you present in booking on October 4th, 2005, when
17 Mr. Al-Khidir was brought into the booking room?
18 A.  I wasn't present when he was brought in.  That was the
19 shift before us.  But we were briefed when we came in.
20 Q.  Did you ever see the booking photo of Only Al-Khidir?
21 A.  I did, sir.
22 Q.  How would you describe that?
23 A.  It was a brutal mess.  He was beat up pretty bad.
24 Q.  Did anyone ever tell you that they had beat him up?
25 A.  Yes, sir.

```
 1   Q.  Who told you that?
 2   A.  That was Deputy Thompson.
 3   Q.  What did Deputy Thompson tell you about how he beat Only
 4   Al-Khidir?
 5   A.  It was nothing specific.  He was pretty tight lipped about
 6   it.  But he had posted that booking photo all over booking.
 7   Q.  You said posted all over booking.  Where was it?  What do
 8   you mean by posted?
 9   A.  He had copies on the front of computer monitors, on the
10   walls, some back in the back.
11   Q.  Do you know why he posted the photo of Only Al-Khidir?
12   A.  I guess he wanted everybody to see it.
13   Q.  What did you do when you saw the photos of Only Al-Khidir
14   posted?
15   A.  Some of them I took down pretty quick.  I was kind of
16   warned away by Thompson telling me don't take them down.  Leave
17   them up.
18   Q.  How many copies of the photo were hanging up?
19   A.  At least half a dozen.
20   Q.  And how long did those photos remain up?
21   A.  Some of them remained up throughout the day.
22   Q.  Did they remain up beyond that day?
23   A.  Not that I can remember.
24   Q.  Do you remember Gaston being present that day?
25   A.  Yes, sir.
```

1   A.   Yes, sir.

2   Q.   Did you see booking officers use OC spray to punish

3   people?

4   A.   At times, yes, sir.

5   Q.   Were there a couple different ways that they would do

6   that?

7   A.   Yes, sir.

8   Q.   Did booking officers spray OC spray on objects inside the

9   holding cells?

10  A.   Sometimes on the bench.  Sometimes on the toilet seat.

11  Q.   When they sprayed OC spray on the toilet seats, were they

12  targeting this towards a particular person?

13  A.   It could very well be.

14  Q.   How often would you see booking officers spray OC spray on

15  the toilet seats?

16  A.   It didn't happen very often, but enough for me to remember

17  it.

18  Q.   And what would happen when an individual at the jail used

19  those facilities?

20  A.   Then they would become contaminated with OC.

21  Q.   How would the booking officers respond when they saw the

22  inmates become contaminated with the OC?

23  A.   It was pretty funny.

24  Q.   Do you remember Defendant Teel spraying toilet seats?

25  A.   I don't remember him specifically doing it, no, sir.

```
 1    Q.  And what was the topic of that conversation?
 2    A.  He was chastising me for having hit the guy in the mouth.
 3    Q.  Was Deputy Stolze concerned about Mr. Eustice's well
 4  being?
 5            MR. JUPITER:  I would object to what this witness
 6  testified to to what he was concerned about.
 7            THE COURT:  He can testify if he knows.
 8    A.  He wasn't concerned about the inmate.  He was concerned
 9  about what I had done.
10    Q.  Why was he concerned about what you had done?
11    A.  He relayed to me that sort of phrase that we would use,
12  red light/green light.  Red light meaning you don't hit to a
13  part of the body that you can visibly see a mark.  Green light
14  meaning you can hit an individual where it cannot normally be
15  seen to the body, things of that nature.
16    Q.  Did Deputy Stolze make a gesture when he was explaining
17  this to you?
18    A.  Yes, sir.
19    Q.  What was the gesture?
20    A.  Red light (indicating), green light (indicating).
21    Q.  Had you heard the phrase -- have you heard the phrase "red
22  light/green light" before?
23    A.  A time or two.
24    Q.  Have you ever heard Defendant Teel talk about it?
25    A.  Not specifically.  I don't remember him saying that.
```