# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARGUERITE CARRUBBA** | § | **PLAINTIFF** |
| | § | |
| **V.** | § | **CAUSE NO. 1:07cv1238-LG-RHW** |
| | § | |
| **HARRISON COUNTY, MISSISSIPPI, BY** | § | |
| **AND THROUGH ITS BOARD OF** | § | |
| **SUPERVISORS; et al.** | § | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART PAYNE'S MOTION FOR SUMMARY
## JUDGMENT AND DENYING PAYNE'S SECOND MOTION TO STRIKE

BEFORE THE COURT are Defendant Harrison County Sheriff George Payne's Motion

for Summary Judgment [224] and Motion to Strike Plaintiff's Evidentiary Exhibits Submitted in

Support of Response to Defendant's Motion for Summary Judgment [254]. Plaintiff Marguerite

Carrubba brought this action for the alleged abuse she received while in the custody of the

Harrison County Adult Detention Center ("HCADC"). Payne argues (1) there is no evidence of a

constitutional violation (2) nor a policy, (3) which was the moving force behind the violation; (4)

she fails to state a Section 1985 claim; (5) there was no conspiracy involving state action, (6) nor

a deprivation of civil rights in furtherance of the conspiracy; (7) she has not lost a civil action;

and (8) punitive damages are not available on the Section 1983 claims. He further argues that

her Exhibits F-H and L-N are inadmissible on summary judgment because they are (9) hearsay,

(10) irrelevant, (11) character evidence, (12) unduly prejudicial, (13) not authenticated, (14)

unsworn, (15) subsequent remedial measures, (16) "back door" expert opinion, and (17) not

based on personal knowledge. The Court has considered the parties' submissions and the

relevant legal authority. Payne is granted summary judgment on the Section 1983 claims for

conspiracy to deny access to courts and punitive damages claim. The Section 1985 claims are dismissed without prejudice. The remainder of the motions is denied.

## FACTS AND PROCEDURAL HISTORY

On the early morning of Saturday, June 17, 2006, Carrubba was involved in a motor vehicle accident in Gulfport, Mississippi. She was subsequently arrested and charged with DUI refusal. She was placed in the custody of the HCADC.

After Carrubba changed into the inmate uniform, she was placed into Holding Cell 8 with other female detainees. After her repeated requests for a phone call, Defendants William Priest and Karl Stolze handcuffed Carrubba behind her back and transferred her to Holding Cell 7, by herself. While alone in there, she managed to slip one hand out of the handcuffs. Priest and Stolze reentered her cell, where she alleges they re-handcuffed her behind her back, and "pulled [her] arms straight up behind [her], kicking [her] feet out from under [her] and slammed [her] chin first into the concrete floor." (Pl.'s Dep. at 45). She was then left in the cell, sitting on the bench. Stolze later reentered the cell and shackled her to the floor. About twenty minutes later, he returned with a jail nurse. Carrubba complained to the nurse of her injuries. She testified that the nurse only responded, "I guess you'll behave," and then she and Stolze left. *Id.* at 52.

Carrubba subsequently filed this lawsuit. She brings claims against Payne under Sections 1983 and 1985 for excessive force; failure to provide medical care; denial of a phone call, food, water, and a bed; covering up the alleged abuse; and conspiracies to use excessive force and to cover up the alleged abuse.

**DISCUSSION**

<u>Motion for Summary Judgment</u>

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. To make this determination, the Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). "[W]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon . . . mere allegations or denials . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

I.       <u>Section 1983</u>

Payne seeks summary judgment on the excessive force, failure to train and supervise, denial of medical care, conspiracy, and punitive damages claims under Section 1983.

A claim against the sheriff in his official capacity is treated as a claim against the county, and sheriffs in Mississippi are the final policymakers with respect to all law enforcement decisions made within their counties. *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir. 1996). A municipality may be held liable under 42 U.S.C. 1983 when its official policies or

customs violate the Constitution. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). The policy or custom must cause the constitutional tort. *Id.* at 691. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Thus, to prove Payne is liable, in his official capacity, under Section 1983, Carrubba must prove (1) the existence of a policymaker, and (2) an official policy or custom, (3) which is the moving force behind a constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

A. EXCESSIVE FORCE

Payne first challenges the excessive force claim, arguing there was no excessive force. In the alternative, Payne argues, that there was neither a policy of excessive force nor was it a moving force behind the violation.

1. CONSTITUTIONAL VIOLATION

The Due Process Clause, applicable to the States via the Fourteenth Amendment, protects a pretrial detainee from excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 395 n.11 (1989). The standard for analyzing an excessive force claim under the Fourteenth Amendment is the same as the Eighth Amendment standard. *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993). This right is violated if there is (1) more than a de minimis injury, (2) which resulted directly and only from the use of force that was excessive to the need, and (3) the force was objectively unreasonable. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). To determine whether the force was excessive, the inquiry is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993). "Often, of course, there will be no evidence of the detention facility official's subjective intent,

and the trier of fact must base its determination on objective factors suggestive of intent." *Id.*

Some of these factors would be (1) the extent of the injury suffered, (2) the need for the

application of force, (3) the relationship between the need and the amount of force used, (4) the

threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the

severity of the forceful response. *Id.* at 1447 n.29.

Payne argues there was no excessive force because (1) the force was in response to

Carrubba's failure to obey verbal commands to stand up and (2) she did not suffer any injury as a

result. The reason Priest gave for the use of force on the Use of Force Report was Carrubba's

"Verbal Non Compliance." (Cabana Aff. Ex. 1 at 5). In the narrative report, he stated that she

"refused verbal commands to stand up and place her hands behind her back." *Id.* at 6. Stolze's

testimony, however, gives no reason for the use of force in Holding Cell 7. All he testified to is

her prior conduct in Holding Cell 8 and in the hallway. He does not state that she was

commanded to stand up in Holding Cell 7, nor that she refused this command. She testified that

all she did was slip herself out of the handcuffs, pace up and down, and finally sit back down.

The video corroborates her testimony. According to her, when the officers reentered the cell, she

was just sitting on the bench. The next event that she says happened was that the officers re-

handcuffed her, kicked her feet out from under her, and slammed her face down into the floor.

The allegation that she had her feet kicked out from under her suggests that at some point she

was standing. She testified that the officers then slammed her back against the bench and left her

sitting on the bench. The next thing that happened was about nine minutes later, Stolze returned

and shackled her handcuffs to the leg of the bench, and neither he, Carrubba, nor any other

witness gives a reason. He testified:

Q. And before you went back into Holding Cell Number 7 at 11:02:53-ish, did you see Marguerite being a problem at any time on this booking video?

A. No.

. . .

Q. All right. And when you leave at 11:03:32, Marguerite is cuffed and on the floor, shackled and on the floor, isn't that right?

A. Yes.

(Stolze Dep. at 102-03). There are genuine disputes of material fact as to whether Carrubba was instructed to stand up and whether she refused this instruction.

As for whether or not Carrubba's injuries were caused by this use of force, the medical records indicate she had bruising on her arms, wrists, chin, and swelling on her lips, and neck and back pain. The medical records described her also as "agitated and jumpy" because of the alleged assault. (Payne's Mot. Summ. J. Ex. C at 6). She was prescribed medication for this as well as for her physical symptoms. She testified that the automobile accident did not hurt her. She testified that the use of force created a knot on her chin as a result of landing on her chin. Her arms and shoulders also hurt after the incident. She testified that since the incident she has had to have physical therapy for her right rotator cuff. She testified she never had this problem with her shoulders before the encounter. She finally testified that she has suffered emotional distress as a result of the alleged excessive force. Thus there is a dispute of fact as to whether the alleged excessive force caused her injuries. Payne argues that she had some pre-existing injuries and her testimony is not credible, but those are questions for the jury.

### 2. POLICY OR CUSTOM

Having found a question of fact regarding whether there was excessive force, the Court

now considers whether there was an excessive force policy. "Official policy is ordinarily contained in duly promulgated policy statements, ordinances, or regulations." *Piotrowski*, 237 F.3d at 579. Where the policy is facially constitutional, the plaintiff must prove that "it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* (quoting *Bd. of the Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)). A custom is a "persistent, widespread practice of [government] officials or employees, which, although not officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579. "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). The Fifth Circuit held:

> Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Id.* at 842. "[T]he sheer numerosity of incidents can provide evidence of constructive knowledge." *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

Carrubba argues that there was a long-term, widespread custom of using excessive force on pre-trial detainees and other inmates at the HCADC. She presents evidence of hundreds of instances of excessive force at the HCADC from 2004 to 2006. She presents evidence that the Sheriff and the Board of Supervisors were warned of this widespread abuse several times before her incident on June 17, 2006.

For example, Stolze and Priest admitted that they and other deputies engaged in a conspiracy to deprive persons of their right to be free from excessive force. This conduct occurred from 2003 to 2006. Stolze and Priest admitted to personally participating in several instances of excessive force and to witnessing additional instances. Likewise, former Deputy Morgan Thompson, Sergeant Dedri Caldwell, and Deputy Thomas Wills each admitted to using unjustified force on over one hundred inmates while they worked at the jail and to witnessing over one hundred additional unjustified assaults committed by other deputies. According to Caldwell, the conspiracy began in 2001. According to Thompson, it ended in September 2006. Former deputies Regina Rhodes and Daniel Evans pled guilty to this same conspiracy and course of conduct.

Rhodes testified that it was common for the correction officers to taunt the inmates who were brought into the booking room. She heard Stolze, Officer in Charge Ryan Teel, Thompson, and Wills engage in this taunting. Intoxicated inmates were more likely to be taunted because "[t]hey were easier targets." (Rhodes Dep. at 13). She observed a pattern of abusing inmates that included "striking, punching, kicking, choking and otherwise assaulting inmates in circumstances that did not justify the use of force." *Id.* at 13-14. She said this excessive force occurred "almost daily while I was employed there," "from May 2004 to February 2006." *Id.* at 14; (Rhodes Plea Agreement at 3). She testified that Teel often encouraged the correction officers to use excessive force and to get involved in instances of excessive force.

Timothy Brandon Moore worked at the jail from 2002 to 2005. He testified that booking officers were mistreating people at the jail. There was a meeting on April 20, 2005, with the booking staff. The purpose of the meeting "was basically to blast booking. It was aimed at the

-8-

excessive force being used." (Moore Test. at 548-49). Despite this meeting, there was no change in booking. It was a daily practice to prepare false reports to cover up excessive force. The booking officers had discussions about the video cameras in booking and how to avoid detection of excessive force. "Captain Gaston said several times, if you have to do anything, do it off camera, in the shower or in the hallway. . . . The cameras were our enemy." *Id.* at 555. The booking officers had theme nights for different days of the week. These included, "Thump a Thug Thursday, Fight Night Friday, Slap a Ho Saturday." *Id.* at 556. They were told to "kick[] ass and not tak[e] names," which meant "we were using excessive force and not writing reports." *Id.* According to Moore the booking officers felt it was funny to use excessive force, and they would laugh and egg on each other. Whenever a female officer had a female detainee in the shower for the dress out procedure, Teel would lead the booking officers in a chant of, "Spray the bitch," to encourage the female officer to use OC spray on the detainee. *Id.* at 567. When he led these chants, he would not be able to see if any force was needed. If the female officer did not spray the detainee, the officer "[w]ould be known as an inmate lover." *Id.*

Priest testified, whenever a detainee was being loud, the officers were instructed by Captain Gaston to get the detainee quiet by whatever means necessary.

> A.    Again, sometimes you could talk a person out of it. Other times, we may have to get a little physical and restrain them to the bench using the leg restraints.
>
> . . .
>
> A.    There's several incidents. Picking individuals up and throwing them on the bench, drag them to the floor, things of that nature.
>
> Q.    And at the time that this force was used, what was the person doing?
>
> A.    Probably just a whole lot of talking, belligerent actions.

(Priest Test. at 403).  The booking officers were instructed, "If an individual had gotten on our nerves, was continuing to become a problem, maybe we need to teach that guy a lesson."  *Id.* at 404.  Several times Priest witnessed booking officers choke people until they passed out.  The officers would sometimes spray the toilet seats and benches with OC spray.  They then would laugh when an inmate would become contaminated with the spray.  The booking officers would have multiple conversations about using excessive force and how to make it look like it was the inmate's fault.  "Jokingly, if somebody was being abused.  It was sort of the thing to say, 'Stop resisting,' whether they were or were not."  *Id.* at 435.  Priest likewise testified that the officers joked about and encouraged each other to use excessive force.  He, too, testified it was a practice to yell, "Spray the bitch," every time a female officer was dressing out a female detainee.  If the officer did not, the others "[m]ight jokingly call her an inmate lover."  *Id.* at 436.

> A.     If you didn't take action against an individual inmate, then you may be labeled as inmate lover, somebody that is sympathetic towards inmates.
>
> Q.     What did it mean to be labeled an inmate lover?
>
> A.     Well, you're either with the group or you're not with the group.

*Id.*

Priest testified that, on October 4, 2005, detainee Only Al-Khidr was brought in the booking room.  Priest was not present, but he was briefed about Al-Khidr when Priest came in on the next shift.  He saw the booking photo, which showed "a brutal mess.  He was beat up pretty bad."  *Id.* at 417.  Thompson admitted to Priest that he had beat up Al-Khidr.  Thompson posted at least six copies of the booking photo all over booking.  When Priest took some down, he "was kind of warned away by Thompson telling me don't take them down.  Leave them up."

*Id.* at 418.  The rest remained up at least throughout the day.

Rhodes testified that red light/green light was a phrase used in booking:

A.      Red light would be the facial area . . . you weren't supposed to hit anything that would show on a booking photo, and green light would be the rest of the body.

Q.      All right.  And how did y'all come to use red light, green light and determine where you should and shouldn't hit?

A.      Well, after Deputy Thompson had a particularly bad booking shot of an inmate named Only, OIC Teel had a impromptu meeting with our shift in the back of booking and inmate records and said that red light, green light–you know, that the chief was–the chief, Captain Gaston, was upset about the booking photo and that we needed to be more careful.

Q.      All right.  Be more careful where you hit people?

A.      Yes, sir.
. . .

Q.      Okay.  So it was okay to hit people as long as it didn't show up on the booking photo?

A.      Yes, sir.

(Rhodes Dep. at 10-11).  Her testimony indicates the red light green light practice was instituted prior to Carrubba's arrival at the jail and was the response to allegations that a deputy had struck another inmate in such a way as to show up on the booking photo.  Priest likewise testified that this practice was known to him.  After Priest had hit a detainee in the mouth, Priest was chastised by Stolze:

A.      He wasn't concerned about the inmate.  He was concerned about what I had done.

Q.      Why was he concerned about what you had done?

A.      He relayed to me that sort of phrase that we would use, red light/green

> light. Red light meaning you don't hit to a part of the body that you can
> visibly see a mark. Green light meaning you can hit an individual where it
> cannot normally be seen on the body, things of that nature.

(Priest Test. at 424). This was a phrase with which Priest was already familiar.

There is evidence that prior to July 2005, Sheriff Payne was actually notified by the United States Department of Justice of its finding of 31 instances of force in a one month period from November 2004 to December 2004, which represented both a "serious increase in the use of force" as well as "a very disturbing pattern of misuse of force." (Pl.'s Resp. Ex. G at 3); (Pl.'s Resp. Ex. H at 3). When asked whether or not he should have known of the custom of excessive force, Sheriff Payne first testified, yes. As he points out, he then denied this, but that is a credibility question for the jury.

Taken together, this and other evidence permit a reasonable jury to find that there was a custom of excessive force that was sufficiently widespread and persistent to constitute an official policy. The evidence that there were hundreds of instances of excessive force, and daily occurrences for over two years prior to June 17, 2006, is sufficient to show that Sheriff Payne had at least constructive knowledge. He admitted that he should have known and admitted that he was on notice for over a year prior to the subject incident. It is undisputed that even members of the Board of Supervisors for the County, who were further removed from the jail than Sheriff Payne, were on notice of the alleged culture of violence at the jail. Finally, the evidence supports a finding of deliberate indifference.

### 3.    MOVING FORCE

The Court next considers whether there is evidence that the alleged policy of excessive force was the moving force behind the alleged excessive force against Carrubba. After due

consideration of the above evidence, the Court must answer this question in the affirmative.

Additionally, Stolze and Priest admitted that they knew of and were a part of this custom of

abuse. Priest admitted that Stolze had specifically instructed him on this custom of abuse. Priest

admitted that part of the custom was to take inmates who were being loud, restrain them to the

bench, and to also pick them up and throw them. There is evidence that this is what happened to

Carrubba. There is significant evidence that the officers at the jail believed it was humorous to

wrongfully assault inmates. There is evidence that eight months prior to the subject incident,

Thompson posted pictures evidencing his assault on another inmate all over the booking room.

Instead of a reprimand, he and the other officers were allegedly further instructed on how to

abuse inmates.

### B.    FAILURE TO TRAIN AND SUPERVISE

Although the First Amended Complaint alleges a failure of the Sheriff, in his official

capacity, to properly train and supervise, this allegation appears to be a part of the excessive

force claim and not alleged as a separate claim. This issue is moot.

### C.    DENIAL OF MEDICAL CARE

Payne argues the denial of medical care claim should be dismissed because the jail nurse

saw Carrubba and, in the alternative, she suffered no injuries as a result. The Court has already

addressed these issues in its contemporaneous Order Denying Stolze's Motion for Summary

Judgment. For the reasons stated therein, Payne is not entitled to summary judgment on the

denial of medical care claim.

### D.    CONSPIRACY

Carrubba asserts Section 1983 claims against Payne for the alleged conspiracies to use

excessive force and to cover it up. Payne challenges the first conspiracy claim, arguing there was no agreement to assault Carrubba and she did not suffer a deprivation of a constitutional right as a result. She responds that there is evidence of these conspiracies and of the resulting excessive force.

"A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act." *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995). To prove a conspiracy claim under Section 1983, the plaintiff must prove (1) a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy, by a party to the conspiracy. *Pfannistel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990).

As discussed previously, Stolze, Priest, and others admitted there was a conspiracy under color of law to use excessive force upon inmates in the booking room. This conspiracy began as late as 2004 and ended as late as September, 2006. The above described evidence indicates that Carrubba was subjected to excessive force as a result of this conspiracy.

Payne argues the second conspiracy claim fails because Carrubba is presently bringing a civil action for the alleged excessive force. She responds that there is a genuine issue of material fact as to whether the conspiracy to cover up existed and whether there was a cover up of the alleged violations.

This particular conspiracy claim alleges a conspiracy to deny Carrubba's access to courts. To pursue this claim, she must prove that the conspiracy "hindered h[er] efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). It is not clear if she is pleading a "forward-looking" or "backward-looking" access claim. A forward looking access claim is a case where

the "litigating opportunity yet to be gained" is being blocked by the defendants. *Christopher v. Harbury*, 536 U.S. 403, 414 (2002). "The object . . . is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* at 413. She cannot prove a forward-looking denial of access, because she has in fact filed the excessive force claim.

A backward-looking claim is about "an opportunity already lost." *Id.* at 414-15. It looks "backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* at 414. For a "backward-looking access claim," Carrubba must prove (1) an underlying cause of action, (2) the litigation of which was frustrated by official acts, (3) which resulted in a lost remedy. *Id.* at 415-16. As for the third element, she:

> must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.

*Id.* at 415. For example, the official deception "may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Id.* at 414.

On the record as it presently stands, the Court finds no evidence that Carrubba has lost a remedy for her excessive force claim. There has yet been no loss nor "inadequate settlement." The Court is provided with no evidence of a lost opportunity to sue Stolze, Priest, or others, or the lost opportunity to seek some particular relief. Therefore, Payne is entitled to dismissal of the Section 1983 conspiracy to deny access to courts.

### E.    Punitive damages

Payne seeks dismissal of Carrubba's punitive damages claim under Section 1983.  She does not respond to this argument.

Punitive damages are not recoverable on Section 1983 claims against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  Since the Sheriff, in his official capacity, is the County, Section 1983 punitive damages are not recoverable against him in his official capacity either.  Payne is entitled to summary judgment on the Section 1983 punitive damages claim.

## II.    Section 1985

Payne argues that Carrubba has failed to state a claim under Section 1985, because the First Amended Complaint does not describe any of the conduct proscribed by that statute.  She responds that there is a genuine issue of fact as to whether there was a conspiracy to use excessive force and to cover up the excessive force.  For the reasons stated in the Court's contemporaneous Order Denying Stolze's Motion for Summary Judgment, the Court finds that the First Amended Complaint fails to state a claim under Section 1985.  The Section 1985 claims are dismissed without prejudice.

## Motion to Strike

Payne argues that Carrubba's Exhibits F-H and L-N are inadmissible on summary judgment.

## I.    Exhibit F

Carrubba's Exhibit F is the Plea Agreements and two Judgments in the criminal cases in which several booking room deputies admitted to excessive force.

First, Payne argues that the Plea Agreements and Judgments are not sworn to nor certified. These documents are court records that were filed in criminal cases presided over by the undersigned. Most of the documents are available to the public through the CM/ECF system. The plea agreements are each signed by several persons, and the judgments are signed and entered by the undersigned. The Court has compared the documents in Exhibit F with those filed in their respective cases in the CM/ECF system and finds that they are authentic. *See United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (holding that a document may be authenticated with circumstantial evidence, including the document's own distinctive characteristics). The Court further notes that, in each respective criminal case, the plea agreement and its basis was sworn to, in open Court, before the undersigned.

Payne next argues that Rhodes, Evans, Thompson, Caldwell, and Wills's plea agreements are hearsay. As this Court has previously ruled, these pleas are public records that fall within the public records and reports exception. Fed. R. Evid. 803(8). Moreover, they are statements against interest. Fed. R. Evid. 804(3).

Payne next argues that Stolze and Priest's plea agreements are character evidence offered to show that they conspired to and did commit excessive force upon Carrubba. First, Payne does not explain why he has standing to raise this objection on behalf of other parties. Further, the Court did not rely on Stolze and Priest's plea agreements to prove that they used excessive force on Carrubba. To the extent the Court relied on Stolze and Priest's plea agreements as evidence they conspired between 2004 and 2006 to use excessive force upon inmates, that is not character evidence. Stolze and Priest pled to the very conspiracy at issue in this case.

Payne argues that Exhibit F is irrelevant as to whether he should have had constructive

knowledge, because (1) the pleas are subsequent to Carrubba's alleged beating, (2) they are "vague and non-specific," and (3) Payne did not have actual knowledge. (Payne's 2d Mot. to Strike at 7). The pleas describe conduct prior to her incident. Specifically, the conduct occurred from as early as 2001 until 2006. The Court does not find the pleas vague and non-specific. Whether they are is a credibility question for the jury. Payne admits that his knowledge is in issue; thus, whether or not he had constructive knowledge is relevant to this case.

Payne argues the pleas and Judgments are untrustworthy because the pleas were negotiated and Thompson recanted portions of his plea in his deposition. Credibility is not for the Court to decide on summary judgment. This argument attacks the weight and not the admissibility of the evidence.

Finally, Payne argues that the evidence is prejudicial because it is an attempt to inflame the jury with evidence of the beating death of Jessie Lee Williams. There is no jury, as this was evidence submitted on a motion for summary judgment. Further, the Williams incident occurred just four months prior to Carrubba's incident. Finally, the Court did not consider the Williams incident.

## II.  EXHIBITS G AND H

Exhibit G is the February 2005 report from Steve Martin of the Department of Justice. Exhibit H is a July 2005 transmittal letter which purports to send the report to Sheriff Payne. Payne argues that both are inadmissible because they are not sworn nor authenticated. Payne admitted he received this report in his deposition. He referenced the report and transmittal letter in his affidavit he submitted on summary judgment.

Payne further objects to them because they reference the Court's 1995 Consent Judgment.

The Court did not rely on them for the Consent Judgment, nor rely on the Consent Judgment itself, so this objection is moot. Further, Payne's affidavit that he submitted on summary judgment referred to the Consent Judgment in defense of Payne's actions, so this objection is also waived.

Finally, Payne objects to the report and letter as evidence of a subsequent remedial measure. A subsequent remedial measure has to be *subsequent* to the incident in issue. Fed. R. Evid. 407. "When, *after* an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of *subsequent* measures is not admissible to prove . . . culpable conduct. . . ." *Id.* (emphasis added). The report and letter came prior to Carrubba's incident. Further, they are not offered to prove that Payne is liable for violating the 1995 Consent Judgment, nor did the Court rely on them for that purpose. Moreover, a subsequent remedial measure can be used for "another purpose" such as notice. *Id.* The Court relied on these exhibits to show constructive notice.

Payne next argues that these letters are hearsay and "back door" expert opinions. The Court relied on these to show constructive notice, not the truth of the matter.

III.     EXHIBIT L

Exhibit L is excerpts from Rhodes's deposition. Payne argues that her deposition testimony "is irrelevant character evidence because Plaintiff has put forward no evidence that Rhodes was present or had personal knowledge of any of the events that occurred on June 17, 2006." (Payne's 2d Mot. Strike at 19). She stated that her testimony was based on her experience and her own personal observations while working at the jail. Payne argues that Rhodes testified that she had no knowledge of whether the Use of Force Report was false. Payne

-19-

does not provide the Court with this testimony.

IV.    EXHIBITS M AND N

Exhibits M and N are the trial testimony of Moore and Priest in the excessive force

criminal trial *United States v. Teel*, 1:06cr79-LG-JMR.

First, Payne argues that these testimonies are not sworn or authenticated.  These exhibits

show that the testimony was sworn, and the Court takes judicial notice of the fact that the

testimony was in fact sworn in open court before the undersigned during the *Teel* trial.  Further,

the Court has carefully compared these exhibits to the official trial transcript in *Teel* and finds

that the exhibits are an exact copy of the relevant portions of that trial transcript.  Therefore, the

Court takes judicial notice of the fact that the testimony is authentic.

Payne next argues that the trial transcripts are hearsay.  Priest's testimony is not hearsay,

because it is an admission by a party opponent.  Fed. R. Evid. 801(d)(2).  As for Moore's

testimony, it is admissible and can be submitted in opposition to a motion for summary

judgment, although it is not submitted in a form that would be admissible at trial.  *See Celotex*,

477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form

that would be admissible at trial in order to avoid summary judgment."); *see also*, *Thomas v.*

*Atoms Energy Corp.*, 223 Fed. Appx. 369, 373 (5th Cir. Mar. 21, 2007) (explaining that

otherwise admissible evidence can be submitted in a form, such as an affidavit, that would not be

admitted at trial).  Further, Moore's trial testimony is a statement against interest.  Fed. R. Evid.

804(3).  That is to say it was a "statement which was at the time of its making so far contrary to

the declarant's pecuniary . . . interest, or so far tended to subject the declarant to civil or criminal

liability . . . that a reasonable person in the declarant's position would not have made the

statement unless believing it to be true." *Id.*

Payne next argues this is character evidence because it is offered to prove that "Thompson" used excessive force. (Payne's 2d Mot. Strike at 11). This argument may have been brought in error, since Thompson is not a party to this case. In any event, Payne does not explain why he has standing to raise this argument. The Court did not consider whether Thompson used excessive force in Carrubba's case.

Payne next argues that the testimony is irrelevant on actual or constructive knowledge, because the testimony came after Carrubba's beating. The testimony clearly concerns matters that occurred prior to Carrubba's beating.

Payne also argues the testimony is irrelevant because the (1) prior beatings are not enough to show a pattern of abuse and (2) the testimony is vague. This is in direct contradiction to his argument on character evidence, where he complains that the testimony shows "a propensity to abuse inmates." *Id.* Finally, these arguments go to the weight of the evidence, not the admissibility.

Payne finally argues the testimony is unfairly prejudicial because it will inflame the jury. There was no jury as this was a motion for summary judgment.

For the foregoing reasons, the Court denies Payne's second Motion to Strike.

**IT IS THEREFORE ORDERED AND ADJUDGED**, that for the reasons stated above, Defendant Sheriff George Payne's Motion for Summary Judgment [224] should be and is hereby **GRANTED** on the Section 1983 claims for conspiracy to deny access to courts and punitive damages. The Section 1985 claims are dismissed without prejudice. The remainder is **DENIED.**

**IT IS FURTHER ORDERED AND ADJUDGED** that Payne's second Motion to Strike

[254] should be and is hereby **DENIED.**

      **SO ORDERED AND ADJUDGED** this the 7th day of May, 2010.


                          s/ *Louis Guirola, Jr.*
                          LOUIS GUIROLA, JR.
                          UNITED STATES DISTRICT JUDGE