

Civil Rights Division

SYC:KWG:WGM:BVL:kdf
DJ 168-41-110

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

July 20, 2005

Sheriff George Payne, Jr.
Harrison County Sheriff's Department
1801 23rd Avenue
Gulfport, MS  39501

Joseph Meadows, Esq.
Meadows, Riley, Koenenn & Teel
1720 23rd Ave.
Gulfport, MS  39502

Dear Sheriff Payne and Mr. Meadows:

Please find enclosed copies of our expert reports from Steve Martin and Dr. John May resulting from our most recent inspection of the Harrison County Adult Detention Center ("HCDC"). We were encouraged during this last inspection with the improvements in security operations and medical and mental health care at the facility. In this letter, we intend to outline those issues which, if fully resolved, would permit the parties to jointly dismiss the outstanding Consent Judgment.

As an initial matter, we applaud the efforts of Sheriff Payne and the Harrison County Board of Supervisors to hire and fund increased numbers of security staff for the HCDC. At the time of our visit, nearly the full complement of 50 additional officers had been hired. Furthermore, HCDC officials have done an excellent job of recruiting, hiring, and training the new staff. As Steve Martin stated in his report, "With these 43 additional officers, coverage for all essential housing posts for all shifts can be provided so long as the facility is managed at or below its safe operating capacity of 760."

Unfortunately, however, the population at the HCDC significantly exceeds the safe operating capacity of 760 established by Sheriff Payne in March of 2001. On December 5, 2004, the HCDC jail population was 1035 with 355 inmates sleeping on the floors in all four cell blocks. The number of inmates

**EXHIBIT "3"**

- 2 -

sleeping on the floors is itself close to the single cell capacity of the HCDC. As of the latest quarterly report ending March 31, 2005, the inmate population remained dangerously overcrowded at nearly 1100 inmates with nearly 400 inmates on the floors in the cell blocks. Our review of the population records indicates that the HCDC is routinely being operated at 130% of its safe operating capacity of 760.

Such overcrowding has again resulted in unsafe operations at the HCDC, despite the increased staffing. The number of inmate disciplinary infractions has soared. For example, in December 2003, there were approximately 20 infractions per 100 inmates. By December 2004, the rate had increased to approximately 75 infractions per 100 inmates. Use of force applications by staff upon inmates has also substantially increased as a result of the serious strain overcrowding has placed upon security at the HCDC. In December 2003, there were approximately ten incidents of staff use of force that included three incidents requiring the use of chemical agents. In December 2004, there were 31 incidents of staff use of force that included 14 uses of chemical agents. Furthermore, in all of our previous reports filed since 1997 in which we reviewed use of force statistics, we only noted one misapplication of the use of force. However, as Steve Martin stated, our latest visit revealed "a very disturbing pattern of misuse of force." With regard to at least four incidents, we have serious concerns over the nature of the misuse of force, the lack of appropriate review of the incidents, and the failure to properly investigate the incidents.

Finally, the overcrowding has severely compromised the inmate classification system and the environmental health and safety of the inmates. HCDC simply lacks enough space to adequately manage special needs populations such as vulnerable inmates and mentally ill inmates. The housing areas, particularly the lavatory and shower areas, are unclean, unsanitary and malodorous. Inmates complain of the scarcity of basic hygiene supplies such as toilet paper, soap, and cleaning supplies.

A significant part of the overcrowding problem can be attributed to a large number of misdemeanor offenders held in the HCDC. The most overcrowded sections of the HCDC are those that house these misdemeanor offenders. From April 1, 2004 through November 15, 2004, this misdemeanor population increased from 94 to 213. These misdemeanor offenders are serving sentences for minor infractions such as unpaid fines, disorderly conduct, public drunkenness and traffic violations and are tying up precious bedspace for significant periods of time. Further

- 3 -

contributing to the overcrowding conditions are the significant numbers of pre-trial detainees held for excessive periods of time awaiting dispositions on charges.

In sum, as Steve Martin reports:

> Severe overcrowding has adversely impacted virtually all areas of operation. The laudable gains made with increased staff are seriously undermined by the sheer number of inmates housed at HCDC. Both the physical plant and security operations are presently compromised to a point at which the facility is unsafe for both inmates and staff.

HCDC officials have responded to the above-stated unsafe conditions with a demonstrated sense of urgency to correct these matters. In fact, Sheriff Payne has on several occasions solicited the advice and assistance of the National Institute of Corrections Jail Division of the Department of Justice in an effort to strengthen HCDC operations. However, such sense of urgency may not result in concrete action without coordination with other key players in the Harrison County criminal justice system. To this end, therefore, we propose opening a dialogue as soon as possible with the necessary key players within the Harrison County criminal justice system designed to discuss and propose alternatives to reduce the inmate population at the HCDC. In this manner, we refer you to Mr. Martin's report and attached Appendix I, in which he reviews solutions initiated by Hinds County, Mississippi. With regard to security operations, the final remaining issue under the Consent Decree between the Department and Harrison County is the harm resulting from overcrowded conditions of confinement. If HCDC officials can bring the inmate population back to its own established safe operating capacity of 760, HCDC's current operations and staffing complement would permit the parties to jointly dismiss the outstanding Consent Judgment.

With regard to medical care at the HCDC, the vendor for medical and mental health services changed in April 2004. The new vendor has done an admirable job of transitioning into the HCDC while maintaining staff morale. Many of the staff, including the current leadership, worked at the facility prior to the change in vendor. They have been pleased with the new vendor who they believe is more responsive to their issues. However, as stated in Dr. May's report, significant issues remain that are causing real and potential harm to the inmates and staff,

- 4 -

particularly the problem with methicillin-resistant staph aureus ("MRSA") soft tissue infections, a skin infection related to crowded conditions and problems with sanitation. As Dr. May stated, "The MRSA situation requires action. These infections are contagious to other inmates, staff within the facility, visitors to the facility, and can be transferred into courtrooms and the community when the detainee is released. The medical staff should be much more aggressive in controlling MRSA."

As contained in Dr. May's report in detail, the following items, if fully implemented, would permit the parties to jointly dismiss the outstanding Consent Judgment with regard to medical and mental health care:

1. Redesign the booking screen questions to adequately identify those with health problems;

2. Have health care staff triage those with affirmative responses in booking and provide timely assessments;

3. Obtain vital signs on all persons coming through booking;

4. Create an area of privacy for health care screenings;

5. Ensure health assessments are conducted on all persons within 14 days;

6. Establish a clear mechanism for detainees to submit sick call request slips;

7. Provide a timely response for sick call requests;

8. Develop a plan to identify, track, treat, and control MRSA infections, including cleaning and repairing the housing units;

9. Maintain current lists of detainees with chronic illnesses and schedule them to have periodic physician evaluations;

10. Ensure that the mental health social worker and correctional leadership be aware at all times of detainees on suicide watch; and

11. House persons on suicide watch in areas without the risk of hanging or self-injury.

- 5 -

We are confident that the parties will be able to resolve the above-identified issues in security operations and medical and mental health care in the near future and, as noted above, offer our assistance in facilitating such resolution as quickly as possible.

Sincerely,

*William G. Maddox*

William G. Maddox
Senior Trial Attorney
Special Litigation Section

cc: Crockett Lindsey